# Exhibit B



## Notice of Service of Process

**TV / ALL**
**Transmittal Number: 22863894**
**Date Processed: 03/08/2021**

| | |
|---|---|
| **Primary Contact:** | Arnold D'Angelo<br>Zurich North America<br>1299 Zurich Way<br>Schaumburg, IL 60196-1056 |
| **Electronic copy provided to:** | Vicky Russell |
| **Entity:** | Zurich American Insurance Company<br>Entity ID Number  2746725 |
| **Entity Served:** | Zurich American Insurance Company |
| **Title of Action:** | Masterworks Development Co LLC vs. Zurich American Insurance Company |
| **Matter Name/ID:** | Masterworks Development Co LLC vs. Zurich American Insurance Company (11025195) |
| **Document(s) Type:** | Citation/Petition |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Harris County District Court, TX |
| **Case/Reference No:** | 2021-12251 |
| **Jurisdiction Served:** | Texas |
| **Date Served on CSC:** | 03/05/2021 |
| **Answer or Appearance Due:** | 10 o'clock a.m. of the Monday next following the expiration of Twenty (20) days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | James J Cooper<br>713-469-3879 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674  (888) 690-2882  |  sop@cscglobal.com

CAUSE NO. 2021-12251

DELIVERED

COPY OF PLEADING PROVIDED BY PLT

03 | 05 | 2021
BY: KCC PSC: 13350

RECEIPT NO: 889819 TRACKING NO: 73846487 LLC

| | |
|---|---|
| Plaintiff: | In The 270th |
| MASTERWORKS DEVELOPMENT CO LLC | Judicial District Court of |
| vs. | Harris County, Texas |
| Defendant: | 201 CAROLINE |
| ZURICH AMERICAN INSURANCE COMPANY | Houston, Texas |

**CITATION CORPORATE**

**THE STATE OF TEXAS**
**County of Harris**

To:    **ZURICH AMERICAN INSURANCE COMPANY (NEW YORK CORPORATION) MAY BE SERVED
THROUGH ITS REGISTERED AGENT CORPORATION SERVICE COMPANY
211 E 7TH STREET STE 620, AUSTIN TX 78701**

Attached is a copy of: ORIGINAL PETITION

This instrument was filed on March 3, 2021 in the above cited cause number and court. The instrument attached describes the claim against you.

**YOU HAVE BEEN SUED.** You may employ an attorney. If you or your Attorney do not file a written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration date of 20 days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org.

This citation was issued on March 4, 2021, under my hand and seal of said court.

Issued at the request of:

COOPER, J. JAMES
811 MAIN STREET, SUITE 1700
HOUSTON, TX 77002-5007
713-469-3879
Bar Number: 04780010



Marilyn Burgess

Marilyn Burgess, District Clerk

Harris County, Texas
201 CAROLINE Houston Texas 77002
(PO Box 4651, Houston, Texas 77210)

Generated By:MARCELLA SINGLETON

Tracking Number: 73846437

## CAUSE NUMBER: 2021-12251

PLAINTIFF: MASTERWORKS DEVELOPMENT CO LLC

vs.

DEFENDANT: ZURICH AMERICAN INSURANCE COMPANY

In the 270th

Judicial District Court of

Harris County, Texas

### OFFICER - AUTHORIZED PERSON RETURN

Came to hand at _____ o'clock ___. M. on the _____ day of _____, 20____. Executed at

(Address)_____
in

_____ County at o'clock ___. M. On the _____ day of _____, 20____, by

Delivering to _____defendant, in person, a true copy of this Citation together with the accompanying _____ copy (ies) of the «Attachment». Petition attached thereto and I endorsed on said copy of the Citation the date of delivery.

To certify which I affix my hand officially this _____day of _____, 20.

Fees $_____

_____
Affiant

By_____
                    Deputy

On this day, _____, known to me to be the person whose signature appears on the foregoing return, personally appeared. After being by me duly sworn, he/she stated that this citation was executed by him/her in the exact manner recited on the return.

SWORN TO AND SUBSCRIBED BEFORE ME, On this _____ day of _____, 20__.

_____
Notary Public

3/3/2021 1:48 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 51117261
By: Patricia Jones
Filed: 3/3/2021 12:44 PM

Cause No. _____

| | |
|---|---|
| MASTERWORKS DEVELOPMENT CO., LLC; CLUB QUARTERS MANAGEMENT COMPANY, L.L.C.; CLUB QUARTERS FRANCHISE NETWORK, L.L.C.; CLUB QUARTERS MEMBERSHIP NETWORK, L.L.C.; CEDAR & WASHINGTON ASSOCIATES, LLC; 11 WEST 51 REALTY LLC; 451 LEXINGTON REALTY LLC; NORTHUMBERLAND HOUSE LIMITED; KINGSWAY LIF HOLDINGS LIMITED; MICHIGAN WACKER ASSOCIATES, L.L.C.; FANNIN & RUSK ASSOCIATES, L.P.; URBAN LIFESTYLE MANAGEMENT, LLC; PTH 40 ASSOCIATES, LLC; MIDTOWN SOUTH OWNER LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> ZURICH AMERICAN INSURANCE COMPANY, <br><br> Defendant. | IN THE DISTRICT COURT OF <br><br> HARRIS COUNTY <br><br> _____ JUDICIAL DISTRICT |

## ORIGINAL PETITION

Plaintiffs, Masterworks Development Co., LLC, ("Masterworks Development"); Club

Quarters Management Company, L.L.C. ("CQ Management"); Club Quarters Franchise

Network, L.L.C. ("CQ Franchise"); Club Quarters Membership Network, L.L.C. ("CQ

Membership"); Cedar & Washington Associates, LLC ("Club Quarters, World Trade Center");

11 West 51 Realty LLC (the "Jewel at Rockefeller Center"); 451 Lexington Realty LLC ("Club

Quarters, Grand Central"); Northumberland House Limited ("Club Quarters, Trafalgar Square");

Kingsway LIF Holdings Limited ("Club Quarters, Lincoln's Inn Fields"); Michigan Wacker

Associates, L.L.C. ("Club Quarters Wacker at Michigan"); Fannin & Rusk Associates, L.P.

("Club Quarters in Houston"); Urban Lifestyle Management, LLC ("Urban Lifestyle"); PTH 40
Associates, LLC ("Park Terrace") and Midtown South Owner LLC ("Club Quarters, Midtown")
(collectively, "Masterworks" or the "Plaintiffs"), bring this action against Defendant Zurich
American Insurance Company ("Zurich"), and in support thereof, allege as follows:

## DISCOVERY

1.      Discovery is requested under Level 3, pursuant to TEX. R. CIV. P. 190.4.

## NATURE OF THE ACTION

2.      The COVID-19 pandemic has been a tragedy that affects all of our lives and
businesses.  Thus far, COVID-19 has infected more than twenty-eight million people and killed
more than 515,000 in the United States, and has caused far too many people and businesses to
suffer great economic harm.

3.      This action arises out of Zurich's effective denial of insurance coverage under an
"all risk" property insurance policy, The Zurich Edge Global Policy, Policy No. PPR0284147-
02, effective from May 19, 2019 to May 19, 2020 (the "2019-2020 Zurich Policy") and its
renewal, Policy No. PPR0284147-03, effective from May 19, 2020 to May 19, 2021 (the "2020-
2021 Zurich Policy") (together, the "Zurich Policy"), for business interruption losses and
associated costs arising in connection with the novel coronavirus and ongoing COVID-19
pandemic.

4.      Additionally, Zurich denied coverage for Masterworks' business interruption
losses and associated costs arising in connection with the novel coronavirus and ongoing
COVID-19 pandemic under the Zurich Prime International Property Damage and Business
Interruption Policy, Policy No. 7111488, effective from May 19, 2019 to May 19, 2020 (the
"Zurich International Policy") that Masterworks purchased to insure, among other things, certain

hotel properties located in London, England. The Zurich Policy and the Zurich International Policy are sometimes collectively referred to herein as the "Policies."

5.      Although, Masterworks timely submitted a claim for its substantial COVID-19 pandemic-related losses under the Zurich Policy, Zurich has yet to respond substantively to the claim. Instead, Zurich sent Masterworks a boilerplate reservation of rights letter referencing numerous inapplicable exclusions, which strongly telegraphs Zurich's intent to deny coverage in breach of its contractual obligations and to abandon its policyholder in its dire time of need. On information and belief, Zurich has denied comparable claims submitted to it by policyholders all over the country reflecting a corporate decision to reject all such claims.

6.      Likewise, in response to Masterworks' timely submitted claim for its substantial COVID-19 pandemic-related losses under the Zurich International Policy, Zurich, without any pretense of conducting a meaningful (or any) investigation of Masterworks' claim, summarily denied coverage under the Zurich International Policy.

7.      The purpose and nature of business interruption insurance is to protect policyholders like Masterworks against losses arising from an inability to continue normal business operations due – as is the case here – to loss or damage sustained as a result of a peril insured against. In other words, the insurance promises to preserve the continuity of the policyholder's earnings when a covered loss occurs.

8.      Now that the COVID-19 pandemic has caused Masterworks to sustain the most pressing and debilitating business interruption loss imaginable, Zurich wrongfully and self-servingly, has sought to avoid its obligations and promises under both the Zurich Policy and the Zurich International Policy.

9.    Masterworks seeks damages for breach of contract against Zurich for its failure to honor its policy obligations.  Masterworks also seeks a judgment declaring the scope of Zurich's obligation to pay Masterworks' losses under the Zurich Policy.

## PARTIES

10.    Masterworks Development is a New York limited liability company.  William Lovejoy, a citizen of New York, is a member of Masterworks Development.

11.    CQ Management is a Connecticut limited liability company.

12.    CQ Franchise is a Delaware limited liability company.

13.    CQ Membership is a Delaware limited liability company.

14.    Urban Lifestyle is a Delaware limited liability company.

15.    Park Terrace is a Delaware limited liability company and owner of the insured hotel at 18 West 40th Street, New York, NY, 10018.

16.    Club Quarters, World Trade Center is a New York limited liability company and owner of the insured hotel at 130 Cedar Street, New York, NY, 10006.

17.    The Jewel at Rockefeller Center is a New York limited liability company and owner of the insured hotel at 11 West 51st Street, New York, NY, 10019.

18.    Club Quarters, New York City, Grand Central is a New York limited liability company and owner of the insured hotel at 128 East 45th Street, New York, NY, 10017.

19.    Club Quarters, New York City, Times Square – Midtown is a New York limited liability company and owner of the insured hotel at 40 West 45th Street, New York, NY, 10036.

20.    Club Quarters, Houston Downtown is a Texas limited partnership and owner of the insured hotel at 720 Fannin Street, Houston, TX, 77002.

21.    Club Quarters, Chicago Wacker at Michigan is a Delaware limited liability company and owner of the insured hotel at 75 East Upper Wacker Drive, Chicago, IL, 60606.

- 4 -

22.     Club Quarters, Lincoln's Inn Fields is a United Kingdom private limited company and owner of the insured hotel at 61 Lincoln's Inn Fields, London WC2A 3JW.

23.     Club Quarters, Trafalgar Square is a United Kingdom private limited company and owner of the insured hotel at 8 Northumberland Avenue, London WC2N 5BY.

24.     Zurich is a New York corporation with its principal place of business in Schaumburg, Illinois.  Zurich is licensed by the state of Texas to sell insurance policies in Texas and sold to the Plaintiffs the Zurich International Policy, which covers risks in Texas and elsewhere. Zurich may be served with summons through its registered agent for service of process in Texas:  Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this cause and jurisdiction to grant all relief requested by Masterworks.  The amount in controversy is within the jurisdictional limits of this Court.

26.     This Court has personal jurisdiction over Zurich because Zurich is licensed to do business in the State of Texas, regularly does business in the State of Texas, agreed to insure property in the State of Texas via the Zurich Policy at issue in this litigation, is an authorized Texas insurer, and has sufficient minimum contacts with the State of Texas such that the assumption of jurisdiction will not offend traditional notions of fair play and substantial justice.

27.     Venue is proper in Harris County, Texas, pursuant to section 15.097(a) of the Texas Civil Practice and Remedies Code because that is where part of the insured property is located.  Venue is also proper in Harris County, Texas, pursuant to section 15.092 of the Texas Civil Practices and Remedies Code, because part of the obligations under the Zurich Policy was to be performed in Harris County, Texas, and the loss occurred in part in Harris County, Texas.

- 5 -

## BACKGROUND

### A. MASTERWORKS' INSURED PROPERTIES

28.     Masterworks owns, operates and/or manages the hotels described herein, all of which conduct business under the "Club Quarters" brand except for the Park Terrace Hotel (collectively, the "Club Quarters Hotels").  The Club Quarters Hotels are designed for business and urban travelers, and their major selling point is the high level of amenities and services they offer.  The hotels feature a variety of restaurants, bars, meeting spaces, and event spaces that attract customers and provide additional revenue streams to Masterworks. The hotels are located in center city locations near major centers of commerce and business.  Masterworks has membership agreements with major corporations, governmental entities and educational institutions, many located near the hotels which entitles such entities to beneficial hotel rates as "members" of the hotels.

29.     Masterworks also owns, operates and/or manages the Park Terrace Hotel.  The Park Terrace Hotel is a luxury hotel overlooking Bryant Park in the heart of midtown Manhattan.

30.     To protect its businesses against property damage and business interruptions, Masterworks insured its hotels, among other properties, under the Zurich Policy.

31.     The Zurich Policy insures Masterworks' hotels in the following locations (the "Scheduled Hotels"):

| Location | Address |
|---|---|
| Club Quarters, Chicago Wacker at Michigan together with the River Hotel | 75 East Upper Wacker Drive, Chicago, IL 60606 |
| Club Quarters, Houston Downtown | 720 Fannin Street, Houston, TX 77002 |
| Club Quarters, New York City, Grand Central together with the Hotel Boutique | 128 East 45th Street, New York, NY 10017 |
| Club Quarters, New York City, Times Square – Midtown | 40 West 45th Street, New York, NY 10036 |
| Club Quarters, New York City, World Trade Center together with World Center Hotel | 130 Cedar Street, New York, NY 10006 |

| The Jewel opposite Rockefeller Center | 11 West 51st Street, New York, NY 10019 |
| Club Quarters, Trafalgar Square together with The Grand at Trafalgar Square | 8 Northumberland Avenue, London WC2N 5BY |
| Club Quarters, Lincolns Inn Field | 61 Lincoln's Inn Fields, London WC2A 3JW, |
| Park Terrace Hotel | 18 West 40th Street New York, NY 10018 |

32.     Each of the Scheduled Hotels is listed on the Schedule of Locations on file with Zurich, with a statement of values, and each of which constitutes an "Insured Location" within the meaning of Section 2.01 of the Zurich Policy.

33.     As set forth in greater detail within, each of the Scheduled Hotels has suffered direct physical loss of or damage to property as a result of the COVID-19 pandemic, the actual physical presence of SARS-CoV-2 (as defined below), and/or the statistically-indisputable physical presence of SARS-CoV-2, has had employees and/or guests test positive for COVID-19, has been the subject of one or more governmentally imposed travel restrictions and/or shut down, stay at home or civil authority orders, has experienced dramatic losses and has incurred extra expense all as a result of the foregoing.

34.     Masterworks' normal business operations also include a substantial revenue stream in the form of fees earned by Urban Lifestyle, CQ Management, CQ Franchise, and CQ Membership.  Urban Lifestyle is entitled to management fees from the Park Terrace Hotel.  CQ Management, CQ Franchise, and CQ Membership are entitled to management, license and membership fees from the Scheduled Hotels, except for the Park Terrace Hotel, as well as the following seven hotels owned by third parties  (the "Managed Hotels"):

| Location | Address |
|---|---|
| Club Quarters Gracechurch | 7 Gracechurch Street, London EC3V 0DR |
| Club Quarters, St. Paul's | 24 Ludgate Hill, London EC4M 7DR |
| Club Quarters, Boston, Faneuil Hall | 161 Devonshire Street, Boston, MA 02110 |

| Club Quarters, Chicago Central Loop | 111 West Adams Street, Chicago, IL 60603 |
| Club Quarters, Philadelphia, Rittenhouse Square | 1628 Chestnut Street, Philadelphia, PA 19103 |
| Club Quarters, San Francisco, Embarcadero | 424 Clay Street, San Francisco, CA 94111 |
| Club Quarters, Washington, DC, White House | 839 17th Street NW, Washington, DC 20006 |

35.     The ubiquitous presence and pandemic spread of SARS-CoV-2[1] and consequent orders of civil authorities have caused either direct physical loss of or damage to property (or both) in U.S. and U.K. locations, including high-volume commercial businesses such as the Scheduled and Managed Hotels.

36.     In particular, in response to the damage being inflicted on property, and to protect the public from further exposure to infected areas and damaged property as well as to prevent person to person airborne transmission within enclosed spaces, state and local governments issued "stay at home" orders and orders closing or limiting access to non-essential businesses. These orders were issued in relation to the known vectors of transmission of COVID-19, with one of the main ones being an infected person shedding SARS-CoV-2 virions into the air or upon fomites at the property and then another person breathing in those virions or touching fomites with SARS-CoV-2 and then touching their mouths or eyes.

37.     These orders required many retail properties and businesses, including the Scheduled and Managed Hotels, to close their doors or severely limit and/or prohibit access to the public, and forced numerous businesses to lay-off or furlough their workforces.  These orders also required closure of amenities, such as common areas, gyms, restaurants, bars, meeting spaces, event spaces and retail options in the Scheduled and Managed Hotels.

---

[1] As used herein, COVID-19 refers to the disease caused by the "novel coronavirus" and any variants, SARS-CoV-2 refers to the virus, "virions" refers to viruses outside of host cells and "fomites" refer to objects and property capable of transmitting virions from person to person.

38.     SARS-CoV-2 and COVID-19 caused direct physical loss of or damage to the

Scheduled and Managed Hotels and surrounding properties, by altering the physical conditions

of the properties so that they were no longer safe or fit for occupancy or use.  Specifically,

SARS-CoV-2 attaches itself to surfaces and properties, thereby producing physical change in the

condition of the surfaces and properties—from safe and touchable to unsafe and deadly.  In

addition, and alternatively, the transmissibility of SARS-CoV-2 and COVID-19 within enclosed

areas, such as the Scheduled and Managed Hotels, renders the air within buildings no longer safe

to breathe.

39.     As a result of the COVID-19 pandemic, the actual physical presence of SARS-

CoV-2, the statistically-indisputable physical presence of SARS-CoV-2, the presence of

individuals who contracted or suffered from COVID-19 at the Scheduled and Managed Hotels

and locations of its customers and suppliers, and related orders of different civil authorities

restricting the operations of certain businesses, including amenities in the Scheduled and

Managed Hotels that were required to be closed to prevent the spread of the pandemic,

Masterworks' business has experienced severe losses of revenue due to a tremendous drop in

occupancy at the Scheduled Hotels, as well as substantially-reduced patronage of revenue-

generation streams at the properties such as sales of food and beverage at various restaurants,

catering services, and renting meeting spaces.  These losses all stem from the pandemic and

SARS-CoV-2, and the physical loss of or damage to property it caused.  Because of the various

orders of different civil authorities, including, but not limited to, shut-down orders and travel

restrictions, including mandatory quarantine requirements for travelers, reservations for the

Scheduled Hotels were canceled and business ground to an almost immediate halt.

40.     In addition to the losses described above, Masterworks has also suffered millions

of dollars in business income losses through the management fee agreements with the Managed

Hotels, which have been forced to suspend, or severely reduce, their operations due to the

physical loss of or damage to their locations from the pandemic or the presence or suspected

presence of COVID-19 and those civil authority orders recognizing physical loss of or damage to

property.

41.     These losses experienced by Masterworks have had a devastating impact on its

business, including forcing certain Scheduled Hotels to default on obligations to various

creditors, including mortgage lenders, and to have to seek additional financing on onerous

terms.  Such defaults may result in foreclosure actions and the loss of one or more hotels.

42.     Likewise, as a result of the pandemic and as a precautionary measure, as well as

the statistically-indisputable physical presence of SARS-CoV-2 and the impact of COVID-19 at

the Scheduled and Managed Hotels as well as confirmed positive COVID-19 infections of

employees at the Scheduled Hotels, Masterworks has also experienced losses from increased

costs of operations due to increased cleaning requirements, investment in personal protective

equipment ("PPE"), and increased costs of cleaning products, equipment, and labor.

43.     Likewise, as a result of the COVID-19 pandemic, the actual presence of SARS-

CoV-2 and related orders of governmental authorities, Masterworks incurred necessary expenses

to safely resume its operations at the Scheduled and Managed Hotels, including, but not limited

to, engaging medical experts, industrial hygienists, and compliance specialists, repairing and

replacing air filtration systems, remodeling and reconfiguring physical spaces, upgrading HVAC

and ventilation systems, installing Plexiglas barriers to protect guests and employees and

purchasing and installing equipment, in general, including software to implement a "contactless"

guest experience for hotel guests and purchasing other equipment. Such remediation measures have been ongoing because of the continuous and repeated recurrence of the coronavirus while the pandemic persists.

44.    In total, Masterworks estimates its losses as exceeding $300 million as a direct result of the pandemic and/or shut down orders.

45.    As part of its prudent business practices, Masterworks maintains all risk insurance coverage for Masterworks' properties, including the Scheduled and Managed Hotels, and operations through the purchase of the Policies.

46.    Broadly speaking, business owners, like Masterworks, that purchase all risk property and business interruption coverage –like that provided by the Policies – have a reasonable expectation that the insurance coverage would apply if they are forced to suspend business operations as a result of an unforeseen, fortuitous event, such as a forced government shutdown of their business as a result of wide-scale damage wrought by a virus or other large-scale disaster. Indeed, it is hard to imagine a more unforeseen, fortuitous event than the unprecedented government orders shuttering restaurants, bars and other facilities throughout virtually the entire country (as well as the U.K.) as a result of SARS-CoV-2 and the COVID-19 pandemic. After faithfully paying insurance premiums for business interruption coverage for years, owners of hotels, restaurants and bars forced to suspend or limit their businesses operations as a result of government-ordered shutdowns have a reasonable expectation that this coverage would apply and protect them in such circumstances.

47.    Nonetheless, even though many business interruption policies, including the Policies, either expressly cover such an event or can reasonably be interpreted as providing such coverage, insurance companies, like Zurich here, have routinely and universally denied claims

submitted by businesses for business interruption coverage during the COVID-19 public health crisis, falsely asserting in many cases that no coverage exists unless there is visible, physical damage to tangible property at the insured location (e.g., the structure of the building in which the business operates or related personal property) and/or that the loss is excluded in the event of a pandemic such as COVID-19. *See* Wall Street Journal, *Pressure Mounts on Insurance Companies to Pay Out for Coronavirus* (Mar. 30, 2020), https://www.wsj.com/articles/pressure-mounts-on-insurance-companies-to-pay-out-forcoronavirus-11585573938.

48.     To the contrary, SARS-CoV-2 and COVID-19 cause direct physical loss of or damage to property, and in many cases, the exclusions relied upon by the insurance companies are either completely inapplicable or should be, and generally are, narrowly and reasonably construed as not being applicable. Such is the case with the Zurich Policy. The loss suffered by Masterworks is not explicitly excluded and thus is a covered loss under the Zurich Policy.

49.     Masterworks promptly and timely made a claim for business interruption insurance coverage under the Zurich Policy. In response, Zurich merely sent a boilerplate reservation of rights letter without conducting any investigation into Masterworks' claim. Rather than timely honor its contractual obligations during this time of crisis and pay Masterworks' claim, Zurich has yet to affirm coverage for or pay Masterworks' claim. Zurich's delay is tantamount to a denial of its express coverage obligations.

50.     Likewise, without attempting even a cursory investigation, Zurich denied coverage for Masterworks' claim for loss at its London locations under the Zurich International Policy. Under these circumstances, Zurich, in its policy, agreed that Masterworks can pursue coverage for its London location losses under the Difference in Conditions provision of the Zurich Policy.

## B. THE COVID-19 GLOBAL PANDEMIC

51.     COVID-19 is an infectious disease known as the "novel coronavirus" caused by

the SARS-CoV-2 virus.  It is believed that the first instance of the disease spreading to humans

was in late 2019, in Wuhan, Hubei Province, China.  In an unprecedented event that has not

occurred in more than a century, a pandemic of global proportions then ensued.

52.     In late 2019, COVID-19 reached the United States and quickly spread across the

country.  As early as February 26, 2020, the Centers for Disease Control and Prevention

("CDC") advised that COVID-19 was spreading freely without the ability to trace the origin of

new infections, also known as community transmission.

### 1.   The Contagious Nature of COVID-19 and SARS-CoV-2

53.     The rapid spread of COVID-19 is due in part to its highly-contagious character.

For example, as of March 1, 2020 there were 42,198 confirmed COVID-19 cases across the

globe.  That number increased to 747,899 confirmed cases in April and 2,421,669 cases in May.

*See* https://graphics.reuters.com/CHINA-HEALTH-MAP/0100B59S39E/index.html.

54.     According to the CDC, "everyone is at risk for getting COVID-19."  A person

may become infected by: (1) coming into close contact (about 6 feet) with a person who has

COVID-19; (2) being exposed to respiratory droplets when an infected person talks, sneezes, or

coughs; and/or (3) touching surfaces or objects that have the virus on them, and then by touching

his or her mouth, eyes, or nose.  *See* https://www.cdc.gov/coronavirus/2019-ncov/faq.html.

55.     Persons with COVID-19 can expel tens of thousands or even hundreds of

thousands or more of SARS-CoV-2 virions each hour.  *See*

http://www.clinlabnavigator.com/sars-cov-2-infectious-dose.html.  In addition, evidence in the

context of influenza viruses supports that persons infected with COVID-19 may expel up to

20,000 virions in a single sneeze. *See, e.g.*, https://www.reuters.com/article/us-flu-cough/whats-in-a-cough-20000-viruses-idUSTRE54B16F20090512.

56.     Likewise, according to a report in *The New York Times*, "[a]n infected person talking for five minutes in a poorly ventilated space can produce as many viral droplets as one infectious cough." https://www.nytimes.com/interactive/2020/04/14/science/coronavirus-transmission-cough-6-feet-ar-ul.html. In addition, one human sneeze can expel droplets that can travel up to 27 feet at nearly a hundred miles an hour.
https://www.nationalgeographic.com/science/2020/04/coronavirus-covid-sneeze-fluid-dynamics-in-photos/.

57.     A particular challenge with COVID-19 is that it is possible for a person to be infected with the disease, but be asymptomatic. *Id.* In fact, at least 44% of all infections occur from people without any symptoms. *See* https://www.nature.com/articles/s41591-020-0869-5.

58.     According to the World Health Organization ("WHO"), the incubation period for COVID-19—*i.e.*, the time between exposure to the coronavirus and symptom onset—can be up to 14 days. Other studies suggest that the period may be up to 21 days. Before infected individuals exhibit symptoms, *i.e.*, the so-called "pre-symptomatic" period, they are most contagious, as their viral loads will likely be very high, and they may not know they have become carriers. In addition, studies from the CDC and others estimate that between 40% and 70% of infected individuals may never become symptomatic (referred to as "asymptomatic" carriers). Pre- and asymptomatic carriers are likely unaware that they are spreading the coronavirus by merely touching objects and surfaces, or by expelling droplets into the air. The National Academy of Sciences has found that the majority of transmission is attributable to

- 14 -

people who are not showing symptoms, either because they are pre-symptomatic or asymptomatic.

### 2. COVID-19 and SARS-CoV-2 Cause Physical Loss and Damage

59.     The persistent presence of the deadly SARS-CoV-2 virions on surfaces and in the air renders buildings and properties damaged, lost, unsafe, unfit, and uninhabitable for occupancy or use.  Virologists, scientists, and researchers have all confirmed that SARS-CoV-2 lives and is active on physical surfaces and in the air.

60.     The scientific community has confirmed that SARS-CoV-2 alters the conditions of properties and buildings such that the premises are no longer safe and habitable for normal use.  In this regard, SARS-CoV-2 causes direct physical loss and damage to buildings and properties.

61.     SARS-CoV-2 has a material existence and is contained in respiratory droplets. These respiratory droplets expelled from infected individuals land on, attach, and adhere to surfaces and objects and physically changes these once safe surfaces to "fomites."  Fomites are objects, previously safe to touch, that now serve as agents and mechanisms for transmissions of deadly, infectious diseases.  This physical alteration makes physical contact with those previously safe, inert surfaces (*e.g.*, walls, handrails, desks) unsafe and potentially deadly.  This represents a physical change in the affected surface or material, which constitutes real and severe damage to and loss of the property.

62.     As noted above, people can become infected with COVID-19 by touching fomites, then touching their eyes, nose, or mouth.  This mode of transmission—indirect transmission via objects and surfaces—is known as "fomite transmission."

63.     Studies from the National Institutes of Health support that SARS-CoV-2 virions may be detected in aerosols, on plastic and stainless steel, and on cardboard.  *See*

https://www.nih.gov/news-events/nih-research-matters/study-suggests-new-coronavirus-may-remain-surfaces-days.

64.     A study of a COVID-19 outbreak published in the CDC's Emerging Infectious Diseases journal identified indirect transmission via objects such as elevator buttons and restroom taps as an important possible cause of a "rapid spread" of the coronavirus in a shopping mall in Wenzhou, China.[2]

65.     The coronavirus remains active and dangerous on some surfaces after infected persons have left a location.  One recent study published in a peer-reviewed journal on October 7, 2020, concluded that the coronavirus remained viable on glass, stainless steel, and money at room temperature.[3]  Other studies have concluded that air conditioning and heating systems assist the spread of COVID-19.[4]  Accordingly, the Environmental Protection Agency ("EPA"), the Occupational Safety and Health Administration ("OSHA"), and the CDC have recommended that facilities increase ventilation with outdoor air and air filtration.[5]

66.     These and other remedial measures must be implemented, at great cost and extra expense, to reduce the amount of SARS-CoV-2 present in the space and to make property safe for its intended use.  These measures demonstrate that SARS-CoV-2 virions cause direct physical loss or damage to interior spaces.

---

[2] See Jing Cai et al., *Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020,* 26 Emerging Infectious Diseases 1343, 1345 (2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article (last viewed Oct. 15, 2020).
[3] Shane Riddell et al., The Effect of Temperature on Persistence of Sars-CoV-2 on Common Surfaces, 17 Virology J. 145 (2020), https://virologyj.biomedcentral .com/articles/10.1186/s12985-020-01418-7
[4] Jianyun Lu et al., COVID-19 Outbreak Associated with Air Conditioning in Restaurant, Guangzhou, China, 26 Emerging Infectious Diseases 1628, 1629 (2020), https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article#r2; Karolina Nissen et al., Long-Distance Airborne Dispersal of SARS-CoV-2 in COVID-19 Wards, Research Square (Oct. 29, 2020), https://www.researchsquare.com/article/rs-34643/v1
[5] EPA, Indoor Air and Coronavirus (COVID-19), https://www.epa.gov/coronavirus/indoor-air-and-coronavirus-covid-19; CDC, COVID-19 Employer Information for Office Buildings (Oct. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/office-buildings.html; OSHA, Guidance on Preparing Workplaces for COVID-19 12 (2020), https://www.osha.gov/Publications/OSHA3990.pdf.

67.     While infected droplets and particles carrying SARS-CoV-2 virions may not be visible to the naked eye, they are physical objects that travel to other objects and cause harm from further infections, and loss of or damage to property.

68.     Without a vaccine, effective control of the spread of COVID-19 relies on measures designed to reduce human-to-human, human-to-surface, and surface-to-human exposure.

69.     The presence, or potential presence, of any SARS-CoV-2 virions renders physical premises unsafe, and thereby impairs their value, usefulness and/or normal function.

70.     The presence of people infected with COVID-19 and releasing or "shedding" SARS-CoV-2 virions at premises renders those premises, including property located at those premises, unsafe and liable to cause infection, resulting in direct physical loss of or damage to the premises and property.

### 3.  **The Impact of the Pandemic in Areas Serviced by Masterworks**

71.     In the United States, there are approximately 28 million confirmed COVID-19 cases.  Moreover, there have been approximately 500,000 deaths in the United States due to COVID-19 as of February 2021.

72.     In the United Kingdom, there have been approximately 4.13 million confirmed COVID-19 cases and approximately 107,000 people have had their lives cut short by the disease.

73.     Likewise, the major metropolitan areas that the Scheduled Hotels and the Managed Hotels service have reported numerous COVID-19 infections, including New York, Chicago, San Francisco, Houston, Philadelphia, Boston, Washington, D.C., and London ("Masterworks' Service Areas").

74.     The CDC and the State of New York keep track of known infections by county. The State of New York has reported approximately 1.6 million COVID-19 infections and 46,454 deaths.  The New York City metropolitan area that Masterworks services has reported

approximately 720,000 COVID-19 infections and 29,000 deaths.  New York City reports there are 5,199 COVID-19 cases per 100,000 as of February 27, 2021.  *See* https://www1.nyc.gov/site/doh/covid/covid-19-data-totals.page#boro.  Per capita positive COVID-19 cases in Manhattan range from 1 in 29 to 1 in 13 per person depending on the neighborhood.  *See* https://www.nytimes.com/interactive/2020/nyregion/new-york-city-coronavirus-cases.html#map.

75.     The CDC and the State of California keep track of known infections by county. The State of California has reported approximately 3.54 million COVID-19 infections and 49,531 deaths.  The San Francisco County area that Masterworks services has reported 33,970 COVID-19 infections and 412 deaths.

76.     The CDC and the State of Illinois keep track of known infections by county.  The State of Illinois has reported approximately 1.18 million COVID-19 infections and 22,506 deaths.  The Cook County area that Masterworks services has reported 470,000 COVID-19 infections and 9,833 deaths.

77.     The CDC and Washington, D.C. keep track of known infections.  The Washington, D.C. area that Masterworks services has reported 39,755 COVID-19 infections and 955 deaths.

78.     The CDC and the State of Massachusetts keep track of known infections by county.  The State of Massachusetts has reported approximately 571,000 COVID-19 infections and 15,853 deaths.  The Suffolk County area that Masterworks services has reported 76,944 COVID-19 infections and 1,674 deaths.

79.     The CDC and the State of Texas keep track of known infections by county.  The state of Texas has reported approximately 2.61 million COVID-19 infections and 42,484 deaths.

The Harris County area that Masterworks services has reported 343,000 COVID-19 infections and 4,854 deaths.

80. The CDC and the State of Pennsylvania keep track of known infections by county. The State of Pennsylvania has reported approximately 920,000 COVID-19 infections and 23,657 deaths. The Philadelphia County area that Masterworks services has reported 117,000 COVID-19 infections and 3,089 deaths.

81. The UK Government keeps track of known infections. The London area that Masterworks services has reported approximately 694,187 COVID-19 infections and approximately 17,504 deaths.

82. Likewise, Masterworks has experienced positive COVID-19 infections at almost all of its properties that it owns or manages.

## C. THE NATIONAL, STATE AND LOCAL RESPONSE

83. On January 30, 2020, with the outbreak spreading outside of China, impacting many countries including the United States, the World Health Organization ("WHO") declared the COVID-19 outbreak a Public Health Emergency of International Concern.

84. On March 11, 2020, the WHO officially declared the COVID-19 outbreak a worldwide pandemic.

85. On March 16, 2020, the CDC and members of the national Coronavirus Task Force issued guidelines to the American public (titled "30 Days to Slow the Spread") to slow the spread of COVID-19. The guidelines advised individuals to adopt far-reaching social distancing measures, such as working from home, avoiding gatherings of more than ten people, and avoiding eating or drinking in restaurants.

86. In or around mid- to late-March 2020, state and local governments across the country recognized the unprecedented and catastrophic situation, and made "state of emergency"

- 19 -

declarations.  Simultaneously, or shortly thereafter, states across the country issued orders

encouraging or requiring citizens to "shelter in place" or "stay at home."  These "stay at home"

orders were issued in major markets that Masterworks services, including New York City,

Northern California, Chicago, and Washington, DC, to name a few.

### 1.  New York

87.      On March 7, 2020, New York Governor Andrew Cuomo declared a Disaster

Emergency for the entire state of New York as a result of COVID-19.

88.      On March 16, 2020, Governor Cuomo issued Emergency Executive Order No.

100, declaring a disaster emergency for the entire State of New York, stating in relevant part that

the Order was given "because of the propensity of the virus to spread person to person and also

because the *virus physically is causing property loss and damage*." (emphasis added).

89.      Likewise, on March 16, 2020, the Mayor of New York City, Bill de Blasio, issued

Emergency Executive Order 100, in part "because the virus physically is causing property loss

and damage" and requiring that all restaurants, bars and cafes close until further notice.

90.      On March 20, 2020, Governor Cuomo issued Executive Order 202.8, which

required non-essential businesses to close in-office personnel functions effective March 22, 2020

at 8:00 P.M.  Also, on March 20, 2020, Governor Cuomo issued the "New York State on

PAUSE" order, which was a 10-point policy:  (i) requiring all non-essential businesses to close,

effective March 22, 2020 at 8:00 P.M.; (ii) prohibiting non-essential gatherings of any size; and

(iii) requiring social distancing when leaving the home to obtain essential services or items.  This

included restaurants, bars, and caterers, among other "non-essential" businesses.  These orders

required Masterworks to close amenities in its buildings such as bars, restaurants, meeting

spaces, and gyms, and to regulate strictly the use of common areas.  New York's stay-at-home

order was effective on March 22, 2020 and was in place until May 15, 2020 per Executive Order

202.31.

2.  **California**

91.     On March 4, 2020, the Governor of the State of California, Gavin Newsom,
declared a state of emergency in California to help the state prepare for broader spread of
COVID-19.

92.     On March 16, 2020, the Mayor of San Francisco, London Breed and health
officials issued Order C19-07, effective until April 7, 2020, requiring residents stay at home
except for essential activities.

93.     On March 19, 2020, Governor Gavin Newsom issued Executive Order N-33-20,
ordering all state residents—"immediately"—to stay at home, "except as needed to maintain
continuity of operations of the federal critical infrastructure sectors," as outlined at
www.cisa.gov/critical-infrastructure-sectors.  California's stay at home order did not have an end
date, and as of June 29, 2020, the Governor's website stated that the order was still in effect but
modified under the Governor's May 4, 2020 reopening announcement.

94.     On March 27, 2020, San Francisco Mayor London Breed, issued a "Sixth
Supplement to Mayoral Proclamation Declaring the Existence of a Local Emergency Dated
February 25, 2020", which states it is being issued because COVID-19 "is causing property loss
or damage due to its proclivity to attach to surfaces for prolonged periods of time."

3.  **Illinois**

95.     On March 15, 2020, Illinois Governor, Jay Robert Pritzker, issued an order
requiring that all businesses in the State of Illinois that offer food or beverages for on-premises,
including hotels, must suspend service for and may not permit on premise consumption.

96.     This executive order stated: "All persons may leave their homes or place of

residence only for Essential Activities, Essential Governmental Functions, or to operate Essential

Businesses and Operations, all as defined below."

97.     On March 20, 2020, Illinois Governor Pritzker issued a stay-at-home order

requiring closure of non-essential activities.

98.     On March 26, 2020, the City of Chicago issued Public Health Order No. 2020-3,

applying the Governor's stay-at-home order and prohibiting gatherings of more than 10 people.

**4.  Washington, D.C.**

99.     On March 24, 2020, Mayor Muriel Bowser issued Order 2020-053.  This Order

required hotels, among other things, to suspend use of their conference facilities, ballrooms, and

dining-in facilities of their restaurants.

100.    On March 30, 2020, Mayor Bowser issued a stay-at-home order for the District of

Columbia.  This order required all non-essential businesses to close.

101.    The stay-at-home order stated: "Individuals may leave their residences (including

their porches and yards) only to engage in Essential Activities including obtaining medical care

that cannot be provided through telehealth and obtaining food and essential household goods;

to perform or access Essential Governmental Functions; to work at Essential Businesses;

to engage in Essential Travel; or engage in Allowable Recreational Activities, as defined

in section IV of this Order."

102.    Additionally, the stay-at-home order provided a response in their frequently asked

questions section as to whether hotels are open, and stated: "Some may have decided to close

due to the decline in tourism and the cancellation of conferences and events.  They are allowed to

continue to offer rooms, but conferences or events are prohibited as they would violate the large

gathering rules."

- 22 -

### 5. Massachusetts

103.    On March 10, 2020, Charles D. Baker, the Governor of the Commonwealth of Massachusetts, issued Executive Order No. 591 and declared a state of emergency in Massachusetts to help the state prepare for broader spread of COVID-19.

104.    On March 15, 2020, Governor Baker issued an emergency order limiting gatherings to 25 people and prohibiting on-premises consumption of food or drink at bars and restaurants.

105.    On March 23, 2020, Governor Baker issued an order temporarily closing all business and organizations that do not provide COVID-19 essential services and prohibited gatherings of more than ten (10) people.

106.    On March 31, 2020, April 28, 2020 and May 15, 2020, Governor Baker entered Orders No. 21, 30 and 32, respectively, extending the closure of non-essential businesses.

107.    These executive orders provided that "restaurants, bars, or other establishments that offer food or beverages to the public shall not permit on-premises consumption of food or beverages."

### 6. Texas

108.    On March 16, 2020, Houston Mayor Sylvester Turner ordered bars and nightclubs to close, and food-service establishments to stop in-service dining.

109.    On March 24, 2020, Harris County Judge Lina Hidalgo and Houston Mayor Sylvester Turner issued a mandatory order for all Harris County residents to stay home if they do not work an essential job.

110.    On April 2, 2020, Greg Abbott, Governor of Texas, issued an order that "every person in Texas shall, except where necessary to provide or obtain essential services, minimize

- 23 -

social gatherings and minimize in-person contact with people who are not in the same household."

### 7. Pennsylvania

111.    On March 19, 2020, Governor Tom Wolf issued an executive order prohibiting all operation of businesses that are not life sustaining and declared that all life sustaining businesses that remain open must follow social distancing practices and other mitigation measures.

112.    On March 23, 2020, Governor Tom Wolf and Secretary of Health Dr. Rachel Levine issued "Stay at Home" orders to Allegheny, Bucks, Chester, Delaware, Monroe, Montgomery, and Philadelphia counties to help mitigate the spread of COVID-19.

113.    On April 1, 2020, Governor Tom Wolf and Secretary of Health Dr. Rachel Levine announced that all 67 of Pennsylvania's counties would be under the "Stay at Home" order.

114.    On April 5, 2020, the Secretary of the Department of Health issued an Order requiring building safety measures, including hotels, which mandated these buildings, "clean, and disinfect high-touch areas routinely in accordance to CDC guidelines, in spaces that are accessible to customers, tenants, and other individuals".

115.    Additionally, this Order mandated hotels "ensure that the facility has a sufficient number of employees to perform the above protocols effectively in a manner that ensures the safety of occupants and employees."

### 8. The United Kingdom

116.    On March 16, 2020 Prime Minister Boris Johnson, advised everyone in the UK to stay at home, stop nonessential contact with others and unnecessary travel, work from home where possible, and avoid social venues.

117.    On March 20, 2020, the UK Government directed various categories of business to close, such as pubs, restaurants, gyms, etc.

118.     On March 23, 2020, the UK Government announced a nationwide lockdown involving the closure of further businesses including all nonessential shops and restrictions on individual movement.

119.     On March 26, 2020, the UK Government introduced regulations to enact the March 23, 2020 directions for a nationwide lockdown and provided for a further closure of nonessential businesses, including bars and restaurants located in hotels.

9. **The Civil Authority Orders Were Issued Because of the Physical Loss Of Or Damage To Property By COVID-19**

120.     These civil authority orders responded to the physical loss of or damage to property caused by SARS-CoV-2, and further presume that given the ubiquitous presence of that virus and consequent spread of COVID-19 due to its highly contagious nature and ability to spread without being detected that the virus has caused and will continue to cause physical loss of or damage to property.

121.     The shutdown civil authority orders issued by the above-mentioned state and local authorities covering non-essential businesses are similar to civil authority orders that have been issued nationwide by other state and local civil authorities. *See* https://www.wsj.com/articles/a-state-by-state-guide-to-coronavirus-lockdowns-11584749351.

122.     Moreover, many state and local civil authorities added onerous restrictions on travel requiring, among other things, that travelers entering a particular jurisdiction to quarantine for 14 days before being able to move about within the area as well as prohibiting hotels from booking out-of-state reservations that were not for the length of the required quarantine period. These restrictions added to the severe disruption to Masterworks' business.

123.     The civil authority orders issued by various state and local authorities were issued in whole or in part because COVID-19 causes physical loss or damage to property.

- 25 -

124.    As a result of the COVID-19 pandemic, the physical presence of SARS-CoV-2 and/or civil authority orders, at each of the Scheduled and Managed Hotels, Masterworks has sustained direct physical loss, time element loss, and has incurred extra expense directly resulting from physical loss of or damage to property of the type insured—including direct physical loss of or damage to property due to the pandemic, presence of SARS-CoV-2, orders of civil authority.

**D. THE PERTINENT POLICY PROVISIONS**

    **1. The Insuring Agreement**

125.    In exchange for a very substantial premium, Zurich agreed to indemnify Masterworks for physical loss of use of property, property damage, business interruption losses, and other under the 2019-2020 Zurich Policy and its renewal, the 2020-2021 Zurich. Zurich also provided business interruption insurance coverage to Masterworks under the 2019-2020 Zurich Policy and its renewal, the 2020-2021 Zurich.[6] True and correct copies of 2019-2020 Zurich Policy and the 2020-2021 Zurich Policy are attached as Exhibits A and B. The Zurich Policy limit is $300 million, subject to a deductible and certain sublimits. Zurich Policy, at 2.03.06, 2.03.08.

126.    Zurich agreed to insure the losses, damage, and expense associated with all of the Scheduled Hotels as well as the Managed Hotels. The Zurich Policy lists Masterworks as the First Named Insured and by virtue of the provisions and definitions of Zurich Policy, as well as the Statement of Values, all Plaintiffs listed herein are Insureds under the Zurich Policy. *See* Zurich Policy Declarations Page.

---

[6] Because terms and conditions alleged throughout are identical in both 2019-2020 Zurich Policy and the 2020-2021 Zurich Policy, any reference to the terms and conditions herein are a reference to both policies.

127. The Insuring Agreement of the Zurich Policy states: "This Policy Insures against direct physical loss of or damage caused by a Covered Cause of Loss to Covered Property, at an Insured Location described in Section II-2.01, all subject to the terms, conditions and exclusions stated in this Policy." Zurich Policy, at 1.01.

128. The Declarations of the Zurich Policy states: "This Policy insures an Insured Location unless otherwise provided." Zurich Policy, at 2.01. The Zurich Policy defines Insured Location as "a Location [l]isted on a Schedule of Locations on file with Company; per most recent statement of values." Zurich Policy, at 2.01.01.

**2. Property Damage Coverage**

129. The Zurich Policy provides "all risks" coverage for covered property. The Property Damage coverage provision states in relevant part:

3.01. COVERED PROPERTY

This Policy insures the following property, unless otherwise excluded elsewhere in this Policy, located at an Insured Location or within 1,000 feet thereof or as otherwise provided for in this Policy.

3.01.01. The Insured's interest in buildings (or structures) including new construction, additions, alterations, and repairs that the Insured owns, occupies, leases or rents.

3.01.02. The Insured's interest in Personal Property, including **Improvements and Betterments**.

Zurich Policy, at 3.01.

130. In exchange for substantial premiums, Zurich agreed to insure Masterworks' Insured Locations, including, but not limited to, the Scheduled Hotels. These Insured Locations, including the Scheduled Hotels, were each scheduled with Zurich pursuant to a statement of values that was provided to Zurich as part of the application process. As discussed in greater detail below, Zurich also agreed to insure Masterworks in connection with the loss of income,

- 27 -

including but not limited to, loss of income associated with reduced management fees paid by the

hotels that Masterworks manages but does not own.

### 3. Time Element Coverage

131.   As part of the protection from "all risks," the Zurich Policy contains Time

Element coverage, which covers claims for monetary loss, such as business interruption losses or

extra expense due to the inability to use a property as intended as a result of damage.

132.   The Zurich Policy provides the following Time Element coverage:

> The Company will pay for the actual Time Element loss the Insured sustains, as
> provided in the Time Element Coverages, during the Period of Liability.  The
> Time Element loss must result from the necessary **Suspension** of the Insured's
> business activities at an Insured Location.  The **Suspension** must be due to direct
> physical loss of or damage to Property (of the type insurable under this Policy
> other than Finished Stock) caused by a **Covered Cause of Loss** at the
> **Location**....

Zurich Policy, at 4.01.01.  The Time Element Coverages include Gross Earnings, Extended

Period of Liability, Extra Expense and Leasehold Interest.

133.   The Zurich Policy defines "Suspension" as "[t]he slowdown or cessation of the

Insured's business activities" or "[a]s respects rental income that a part or all of the Insured

Location is rendered untenable."

134.   The Zurich Policy covers **Gross Earnings**, the "value that would have been

earned during the Period of Liability, less charges and expenses that do not necessarily continue

during the Period of Liability." Zurich Policy, at 4.02.01.02.03. The Zurich Policy promises to

"pay the reasonable and necessary expenses incurred (except the cost to extinguish a fire) by the

Insured to reduce the amount of Gross Earnings loss during the Period of Liability."  Zurich

Policy, at 4.02.01.02.04.

135.   As a result of the COVID-19 pandemic, the actual presence of SARS-CoV-2, and

related orders of civil authorities, Masterworks and its customers were forced to shutter or

- 28 -

suspend operations at the Scheduled Hotels and the Managed Hotels.  These closures have adversely affected Masterworks' revenue.

      136.    The Extra Expense coverage is as follows:

The Company will pay for the reasonable and necessary Extra Expenses incurred by the Insured, during the Period of Liability, to resume and continue as nearly as practicable the Insured's normal business activities that otherwise would be necessarily suspended, due to direct physical loss of or damage caused by a **Covered Cause of Loss to Property** of the type insurable under this policy at a **Location.**

…. Extra Expenses mean that amount spent to continue the Insured's business activities over and above the expenses the Insured would have normally incurred had there been no direct physical loss of or damage caused by a **Covered Cause of Loss** to Property of the type insurable under this policy at a **Location**.  Extra Expense does not include any Gross Earnings loss or Gross Profit loss, the cost of permanent repair or replacement of property that has suffered direct physical loss or damage, or expenses otherwise payable elsewhere in the Policy.

Zurich Policy, at 4.02.03.

      137.    Masterworks has suffered increased costs of operations due to increased cleaning, investment in PPE, and increased costs of labor resulting from the COVID-19 pandemic.

      138.    Likewise, in order to safely operate its Scheduled Hotels, as a result of the COVID-19 pandemic, and/or the actual presence of SARS-CoV-2 and/or related orders of civil authorities, Masterworks incurred necessary expenses to safely resume its operations at the Scheduled Hotels, including, but not limited to, engaging medical experts, industrial hygienists, and compliance specialists, repairing and replacing air filtration systems, remodeling and reconfiguring physical spaces, upgrading HVAC and ventilation systems, installing Plexiglas barriers to protect guests and employees and purchasing and installing equipment and software to implement a "contactless" guest experience for hotel guests.  These remedial measures and the expenses incurred by Masterworks have been ongoing because of the continuous and repeated recurrence of the coronavirus while the pandemic persists.

139.    The Zurich Policy provides the following **Leasehold Interest** coverage:

The Company will pay for the actual Leasehold Interest loss incurred by the Insured (as lessee) resulting from direct physical loss of or damage caused by a **Covered Cause of Loss** to a building (or structure) which is leased and not owned by the Insured, as follows:

If the building (or structure) becomes wholly untenantable or unusable and the lease agreement requires continuation of the rent, the Company will pay the Insured the present value of the actual rent payable for the unexpired term of the lease, not including any options;

Zurich Policy, at 4.02.04.

140.    The Zurich Policy provides the following Civil or Military Authority coverage:

The Company will pay for the actual Time Element loss sustained by the Insured, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** is caused by order of civil or military authority that prohibits access to the **Location**. That order must result from a civil authority's response to direct physical loss of or damage caused by a **Covered Cause of Loss** to property not owned, occupied, leased or rented by the Insured or insured under this Policy and located within the distance of the Insured's Location as stated in the Declarations. The Company will pay for the actual Time Element loss sustained, subject to the deductible provisions that would have applied had the physical loss or damage occurred at the Insured Location, during the time the order remains in effect, but not to exceed the number of consecutive days following such order as stated in the Declarations up to the limit applying to this Coverage.

Zurich Policy, at 5.02.03.

141.    Civil authority orders were issued in Masterworks' Service Areas in response to direct physical loss of or damage to property caused by the COVID-19 pandemic, the actual physical presence of SARS-CoV-2, the statistically-indisputable physical presence of SARS-CoV-2, The direct physical loss of or damage to property, other than the Scheduled and Managed Hotels, caused by the COVID-19 pandemic, the actual physical presence of SARS-CoV-2, the statistically-indisputable physical presence of SARS-CoV-2, is a covered cause of loss under the Zurich Policy and upon information belief, occurred within five miles of the Scheduled and Managed Hotels. Masterworks was forced to suspend its business activities at

the Scheduled Hotels because the civil authority orders issued in Masterworks' Service Areas prohibited Masterworks' full access to the Scheduled Hotels by imposing physical limits on their use, including but not limited to, restricting access in-person dining at the restaurants, closing the bars, limiting the number guests allowed in common areas and meeting spaces.

142.    The Zurich Policy provides the following Contingent Time Element coverage:

This Policy covers the actual Time Element loss as provided by the Policy, sustained by the Insured during the Period of Liability directly resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** results from direct physical loss of or damage caused by a **Covered Cause of Loss** to Property (of the type insurable under this Policy) at **Direct Dependent Time Element Locations, Indirect Dependent Time Element Locations,** and **Attraction Properties** located worldwide....

Zurich Policy, at 5.02.05.

143.    The Zurich Policy defines Direct Dependent Time Element Location as:

Any **Location** of a direct: customer, supplier, contract manufacturer or contract service provider to the Insured;

Any **Location** of any company under a royalty, licensing fee or commission agreement with the Insured.

Zurich Policy, at 7.16.

144.    The Managed Hotels are Dependent Time Element Locations as defined in the Zurich Policy.

145.    Masterworks' normal business operations include a substantial revenue stream in the form of management fees from the Managed Hotels. As a result of the COVID-19 pandemic, the actual physical presence of SARS-CoV-2, the statistically-indisputable physical presence of SARS-CoV-2 and/or civil authority orders, as business at the Managed Hotels suffered severe reduction, Masterworks' revenue from these management fees was severely reduced as well.

146.    **Indirect Dependent Time Element Location** is defined as:

- 31 -

Any **Location** of a company that is a direct: customer, supplier, contract manufacturer or contract service provider to a **Direct Dependent Time Element Location**; or

Any **Location** of a company that is an indirect: customer, supplier, contract manufacturer or contract service provider to a **Direct Dependent Time Element Location**.

Zurich Policy, at 7.28.

147.   **Attraction Properties** is defined as "[a] property within the distance described in the declaration [5 miles] of an Insured Location that attracts customers to the Insured's business." Zurich Policy, at 2.03.09; 7.04.

148.   All of the Scheduled Hotels and Managed Hotels are located within five miles of Attraction Properties such as famous restaurants, museums, and sporting venues.  For example, the Club Quarters, New York City, Times Square – Midtown is located within a few blocks of several iconic Manhattan attractions, including Times Square, Broadway, and Rockefeller Center.  As a result of the COVID-19 pandemic, the actual physical presence of SARS-CoV-2, the statistically-indisputable physical presence of SARS-CoV-2 and/or civil authority orders, Attraction Properties within five miles of the Scheduled Hotels have suffered physical loss of or damage to their properties of the type covered under the Zurich Policy, which in turn have caused Masterworks and its customers/members to shutter,  severely restrict, or suspend operations at the Scheduled Hotels and the Managed Hotels, adversely affecting Masterworks' revenue.

149.   The Zurich Policy provides the following Professional Fees Coverage:

This Policy covers the actual costs incurred by the Insured, of reasonable fees paid to the Insured's accountants, architects, auditors, engineers, or other professionals and the cost of using the Insured's employees, for producing and certifying any details contained in the Insured's books or documents, or such other proofs, information or evidence required by the Company resulting from loss or damage payable under this Policy for which the Company has accepted liability.

- 32 -

Zurich Policy, at 5.02.22.

150.    Masterworks has incurred and will continue to incur Professional Fees to produce

and certify details in its books or documents, as well as other proofs, information or evidence

relating to the loss or damage payable under this Policy.

151.    The Zurich Policy provides the following Protection and Preservation of Property

Coverage:

> This Policy covers, up to the limit applying to this Coverage:
>
> 5.02.23.01. The reasonable and necessary costs incurred for actions to temporarily protect or preserve Covered Property; provided such actions are necessary due to actual or imminent physical loss or damage due to a **Covered Cause of Loss** to such Covered Property; and
>
> 5.02.23.02. The Gross Earnings loss or Gross Profit loss sustained by the Insured for a period of time not to exceed the hours listed in the Declarations prior to and after the Insured first taking reasonable action for the temporary protection and preservation of Covered Property.
>
> 5.02.23.03. This Coverage is subject to the deductible provisions that would have applied had the physical loss or damage occurred.

Zurich Policy, at 5.02.23.

152.    Masterworks has incurred costs necessary to protect and preserve the Scheduled

Hotels from direct physical loss of or damage to property due to a covered cause of loss under

the Zurich Policy.

### 4.    Difference In Condition Coverage

153.    The Zurich Policy contains a Difference In Conditions provision that states in

relevant part:

> 5.02.34 DIFFERENCE IN CONDITIONS/DIFFERENCE IN LIMITS
>
> The insurance under this policy applies on a Difference in Conditions basis and a Difference in Limits basis when a **Specific Local Policy** is in force, as follows:
>
> 5.02.34.01. Difference in Conditions - provided there is a loss or damage where:

There is a **Specific Local Policy**(ies) intended to respond to such loss or damage in that country; and due to the difference in its terms, including but not limited to a coinsurance or average clause, does not provide coverage for such loss or damage.

In that event, under this provision, we will pay for such loss or damage where coverage is provided under the terms and conditions of this policy and when the **Covered Cause of Loss** or definitions or conditions set forth under this policy and its endorsements are broader in meaning or scope than those of the local insurance policy(ies).

154.    The Club Quarters Hotels located in London are also insured under the Zurich International Policy, which is a Specific Local Policy as defined by the Zurich Policy. Zurich denied coverage for Masterworks' claims under the Zurich International Policy. Accordingly, while Masterworks disagrees with this denial and reserves all rights to sue under the Zurich International Policy at a later time, Masterworks now seeks insurance coverage under the Zurich Policy for its covered losses at its Club Quarters Hotels in London.

155.    The Zurich Policy contains the following Contamination Exclusion:

3.03.    EXCLUSIONS

The following exclusions apply unless specifically stated elsewhere in this Policy:

3.03.01.        This Policy excludes the following unless it results from direct physical loss or damage not excluded by this Policy.

3.03.01.01.            **Contamination**, and any cost due to **Contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy, except as provided by the Radioactive Contamination Coverage of this Policy.

156.    Unlike other Exclusions in Section III Property Damage, the **Contamination** Exclusion bars coverage only for "cost[s]," and not "[l]oss or damage" or "direct physical loss or damage." Zurich Policy, at 3.03.01.03, 3.03.02.01, 3.03.02.02, 3.03.02.03, 3.03.02.05 and 3.03.03.

157.    As used in the Zurich Policy, the term "costs" clearly refers to out-of-pocket

expenditures.  Zurich Policy, at 5.02.06, 5.02.06.01, 5.02.07, 5.02.10 and 5.02.12.  "Costs" does

not refer to "losses" such as the "loss" covered by the time element coverage, including the Civil

or Military Authority provision.

158.  The Zurich Policy defines **Contamination** and **Contaminants** as follows:

7.09.  **Contamination(Contaminated)** - Any condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, **Fungus**, mold or mildew.

7.10.  **Contaminant(s)** - Any solid, liquid, gaseous, thermal or other irritant, pollutant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), asbestos, ammonia, other hazardous substances, **Fungus** or **Spores**.

159.  As discussed more fully below, this provision is amended by endorsement to the

Zurich Policy.

160.  The Amendatory Endorsement – Louisiana, Zurich American form EDGE-219-C

(01/18), states that "**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ

IT CAREFULLY.**"  Amendatory Endorsement – Louisiana.

161.  The Amendatory Endorsement – Louisiana contains no limiting language

indicating that its scope is confined to any particular subset of claims, nor does it apply by its

terms only to Louisiana.  This is in contrast to other endorsements in the Zurich Policy such as

the Amendatory Endorsement – Connecticut, ("THIS ENDORSEMENT CHANGES THE

POLICY AND APPLIES TO THOSE RISKS IN CONNECTICUT. PLEASE READ IT

CAREFULLY.") and the Amendatory Endorsement – New York ("THIS ENDORSEMENT

CHANGES THE POLICY AND APPLIES TO THOSE RISKS IN NEW YORK. PLEASE

READ IT CAREFULLY.").  These endorsements are also on Zurich EDGE forms.

162.  The Amendatory Endorsement – Louisiana changes a number of provisions in the

Zurich American Policy, as follows:

1.      SECTION III – PROPERTY DAMAGE, C. EXCLUSIONS, paragraph
        3.03.01.01.is deleted in its entirety and replaced by the following:

        3.03.01.01. **Contamination** or asbestos, and any cost due to
        **Contamination** or asbestos including the inability to use or occupy
        property or any cost of making property safe or suitable for use or
        occupancy.

                              *    *    *

11.     The following is deleted from SECTION VII - DEFINITIONS

                **Contamination(Contaminated)** - Any condition of property due to
                the actual presence of any foreign substance, impurity, pollutant,
                hazardous material, poison, toxin, pathogen or pathogenic organism,
                bacteria, virus, disease causing or illness causing agent, **Fungus**,
                mold or mildew.

        and replaced by the following:

                **Contamination(Contaminated)** - Any condition of property due to
                the actual presence of any **Contaminant(s)**.

12.     The following is deleted from SECTION VII – DEFINITIONS:

                **Contaminant(s)** - Any solid, liquid, gaseous, thermal or other
                irritant, pollutant or contaminant, including but not limited to
                smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste
                (including materials to be recycled, reconditioned or reclaimed),
                asbestos, ammonia, other hazardous substances, **Fungus** or **Spores**.

        And replaced with the following:

                **Contaminant(s)** - Any solid, liquid, gaseous, thermal or other
                irritant, including but not limited to smoke, vapor, soot, fumes,
                acids, alkalis, chemicals, waste (including materials to be recycled,
                reconditioned or reclaimed), other hazardous substances, **Fungus** or
                **Spores**.

E.  **MASTERWORKS SUFFERED AND CONTINUES TO SUFFER COVERED LOSSES AND EXPENSES
    CAUSED BY THE SUSPENSION OF ITS OPERATIONS RESULTING FROM INSURED PHYSICAL
    LOSS OR DAMAGE TO INSURED LOCATIONS, INCLUDING THE SCHEDULED HOTELS AND THE**

**MANAGED HOTELS OR, ALTERNATIVELY, BECAUSE OF THE CIVIL AUTHORITY ORDERS ISSUED IN MASTERWORKS' SERVICE AREAS**

163.     SARS-CoV-2 or SARS-CoV-2-containing fomites, respiratory droplets, and nuclei physically alter property to which they adhere, attach or come into contact with, including, without limitation, by altering the surfaces of that property and/or by making physical contact with those previously safe, inert materials dangerous.

164.     When individuals carrying SARS-CoV-2 breathe, talk, cough, or sneeze, they expel aerosolized droplet nuclei that remain in the air and, like poisonous fumes, make the premises unsafe and affirmatively dangerous as SARS-CoV-2 physically alters the air.  Air inside buildings that was previously safe to breathe, but can no longer safely be inhaled due to SARS-CoV-2, has undergone a physical alteration.

165.     The presence of SARS-CoV-2 and COVID-19, including but not limited to SARS-CoV-2 droplets or nuclei on solid surfaces and in the air at insured property, has caused and will continue to cause direct physical damage to physical property and ambient air at the premises.  SARS-CoV-2, a physical substance, has attached and adhered to Masterworks' insured properties, including the Scheduled Hotels, as well as the Managed Hotels and by doing so, altered those properties.  Such presence has also directly resulted in loss of use of those facilities.

166.     On information and belief, persons who were pre-symptomatic or asymptomatic and unknowingly carrying SARS-CoV-2, including but not limited to guests, visitors, and employees were present at the Scheduled and Managed Hotels immediately before the various state and local civil authority orders were issued.

167.     Masterworks has suffered direct physical loss of or damage to property insured by the Zurich Policy.  Specifically, at each of the Scheduled and Managed Hotels, Masterworks has

- 37 -

sustained direct physical loss, time element loss, and has incurred extra expense directly
resulting from physical loss of or damage to property of the type insured—including direct
physical loss of or damage to property due to the pandemic, presence of SARS-CoV-2, orders of
civil authority.

168.    Likewise, the COVID-19 pandemic, the physical presence of SARS-CoV-2 and
the resulting civil authority orders have caused and continue to cause direct physical loss of or
damage to Masterworks' direct and indirect customers, including the Managed Hotels, because
Masterworks' Scheduled Hotels and the property of its direct and indirect customers, including
the Managed Hotels, have lost functionality and/or been rendered unusable for their intended
purpose, and/or unsafe for normal human occupancy or continued use and because these orders
imposed operating restrictions constituting a direct physical loss of property on their premises by
limiting their use or full use of their physical space.  This has led to a suspension of
Masterworks' business activities directly resulting from a covered cause of loss at those Direct
and Indirect Dependent Time Element Locations.

169.    Because the COVID-19 pandemic and the civil authority orders have severely
impacted the availability of amenities at the Scheduled and Managed Hotels, Masterworks has
suffered and continues to suffer additional losses.  Further, because the COVID-19 pandemic and
the civil authority orders have severely impacted the Scheduled and Managed Hotels' ability to
operate and their guests' ability to fully use the Scheduled and Managed Hotels' facilities,
Masterworks has suffered and will continue to suffer business interruption losses, including
additional business interruption losses for civil authority and contingent business interruption,
among other losses.

170.   Among other losses, as a result of the COVID-19 pandemic, and/or the actual presence of SARS-CoV-2 and/or related orders of governmental authorities, Masterworks incurred necessary expenses to safely resume its operations at the Scheduled Hotels, including, but not limited to, engaging medical experts, industrial hygienists, and compliance specialists, repairing and replacing air filtration systems, remodeling and reconfiguring physical spaces, upgrading HVAC and ventilation systems, installing Plexiglas barriers to protect guests and employees and purchasing and installing equipment and software to implement a "contactless" guest experience for hotel guests.  Such remediation measures have been ongoing because of the continuous and repeated recurrence of the coronavirus while the pandemic persists.

171.   In addition to the losses described above, Masterworks has also suffered millions of dollars in business income losses through the reduction of management fees owed to it pursuant to management agreements with the Managed Hotels, which have been forced to suspend or severely limit their operations due to the physical loss of or damage to their locations from the presence or suspected presence of SARS-CoV-2, the COVID-19 pandemic and those civil authority orders recognizing direct physical loss of or damage to property.

172.   Likewise, as a result of the COVID-19 pandemic and/or the statistically-indisputable physical presence and impact of SARS-CoV-2 at the Scheduled and Managed Hotels as well as confirmed positive COVID-19 infections of employees at the Scheduled and Managed Hotels, Masterworks has also experienced losses from increased costs of operations due to increased cleaning requirements, investment in PPE, and increased costs of labor.

173.   In the alternative, even if this Court finds that the statistically-indisputable physical presence and impact of SARS-CoV-2 at the Scheduled and Managed Hotels has not

caused loss of or damage to the Scheduled and Managed Hotels, Masterworks' Scheduled Hotels and the Managed Hotels have still suffered physical loss.

174.    The on-site SARS-CoV-2, fomites, and respiratory droplets or nuclei containing SARS-CoV-2 in the air and attached to surfaces within Scheduled and Managed Hotels and deprived, partially and/or totally, Masterworks and its customers of the physical use of their properties by making them unsafe and unusable and thereby lost.  This is analogous to a scenario such as gasoline spill at a property, which would cause significant loss of use of the property by rendering the property unsafe for use until the gasoline spill was cleaned from the property.

175.    These physical losses to Masterworks' Scheduled Hotels and the Managed Hotels include without limitation the rendering of its insured property from a satisfactory state to a state dangerous and/or unsatisfactory for use because of the fortuitous presence and effect of SARS-CoV-2, fomites, and respiratory droplets or nuclei directly upon the property or the threat that such droplets would be present if the properties were allowed to run at their normal capacity.

176.    These physical losses to the Scheduled and Managed Hotels include without limitation the physical loss of the ability to use the Scheduled and Managed Hotels for their primary functions.

177.    The civil authority orders issued because of the COVID-19 pandemic in Masterworks' Service Areas caused physical loss of property at the Scheduled and Managed Hotels.

178.    The civil authority orders issued because of the COVID-19 pandemic imposed physical limits on the Scheduled and Managed Hotel by imposing limits on their use of their physical spaces, including restricting restaurants from using in-person dining and closing on-site bars.

179.   The physical limitations imposed by the civil authority orders, issued because of

the COVID-19 pandemic, constitute physical loss of property at the Scheduled and Managed

Hotels that is not excluded under the Zurich Policy.

180.   For the foregoing reasons, Masterworks has suffered and will continue to suffer

direct physical loss of property that is insured under the Zurich Policy.

## F.   MASTERWORKS' CLAIMS AND SATISFACTION OF CONDITIONS PRECEDENT

181.   On December 22, 2020, Masterworks provided timely notice of its claim under

the Zurich Policy to Zurich.

182.   The claim complies with all applicable terms and conditions of the Zurich

Policy and/or applicable law.

183.   Masterworks has substantially performed or otherwise satisfied all conditions

precedent to bringing this action and obtaining insurance coverage under the Zurich Policy and

applicable law, or alternatively, Masterworks has been excused from performance by Zurich's

acts, representations, conduct and/or omissions.  Alternatively, by its conduct and actions, Zurich

has waived any such conditions or should be estopped from asserting them.

184.   Masterworks has paid all premiums due under the Zurich Policy.

## G.   ZURICH'S IMPROPER EFFECTIVE DENIAL

185.   On January 29, 2021, Zurich summarily denied Masterworks' timely submitted

claim for its substantial COVID-19 pandemic-related losses under the Zurich International

Policy, without any pretense of conducting a meaningful (or any) investigation of Masterworks'

claim.

186.   On February 12, 2021, Zurich, without conducting any meaningful investigation,

responded to Masterworks' claim with a reservation of rights strongly signaling its intent to deny

coverage owed to Masterworks.  Upon information and belief, Zurich has denied all claims

COVID-19 pandemic-related business interruption losses for all of its policyholders throughout the United States, indicating that Zurich has a business policy not to pay these claims.

187.    In its reservation of rights letter, Zurich sent a clear message that it did not intend to pay Masterworks' significant losses when Zurich self-servingly concluded: "it does not appear that the presence of the COVID-19 virus constitutes direct physical loss or damage to property." As discussed above, Masterworks reported the presence of SARS-CoV-2 at the Scheduled and Managed Hotels to Zurich. Civil authority orders, including, for example, those issued in New York and California explicitly acknowledge, "the virus physically is causing property loss and damage."

188.    Likewise, Zurich offered no meaningful explanation as to why Masterworks' reporting of damaging COVID-19 at the Scheduled and Managed Hotels, and ensuing losses that Masterworks has suffered because of that presence, including increased cleaning costs and PPE purchases as well as the suspension of many of its revenue-generating amenities and management fee losses are not covered under the Policy. Zurich also ignored that many civil authority orders were issued explicitly based on the fact that SARS-CoV-2 causes physical loss of or damage to property.

189.    Finally, Zurich makes a passing reference to a scattershot of exclusions, including the Contamination Exclusion that purportedly "may come into play . . . ." To the contrary, even if the Contamination Exclusion in the body of the Zurich Policy, as opposed to the endorsement replacing it with a clearly inapplicable exclusion, were operative, which it is not, the "Contamination" Exclusion plainly does not apply to Masterworks' losses. Masterworks' losses are covered under the Zurich Policy and are not excluded by the Contamination Exclusion because the Contamination Exclusion only excludes **costs** due to contamination, not **losses** such

- 42 -

as Time Element losses. Moreover, the Contamination Exclusion only applies to costs incurred as a direct result of contamination, not costs incurred as a result of other causes.

190. Furthermore, the terms in this exclusion are well-established terms of art in environmental law and applicable to industrial contaminants used or maintained in the course of an insured's business that may be accidentally released or discharged from their containment. This exclusion does not apply to Masterworks' claim. Indeed, there is no pandemic exclusion in the Policy despite the availability in the insurance industry of such an exclusion and in fact Zurich incorporated such an exclusion in the policies it sold to other policyholders

191. In the alternative, even if this Court determines that the Contamination Exclusion does not refer to industrial type contamination, the Contamination Exclusion still has no application here.

192. First, the government orders shutting down properties or ordering people to stay at home did so because of the pandemic. The Contamination Exclusion does not address in anyway a global pandemic, which is a distinct, catastrophic event, generally occurring once every century. A pandemic is not a "virus" on a magnified scale but rather is a natural disaster comprising unique features such as the (i) emergence of a new viral strain to which the general populations lack sufficient immunity, (ii) ability of this new strain to infect humans and to cause severe disease, and (iii) capability to transmit efficiently among humans, i.e., be highly contagious, and have a vehicle for worldwide spread.

193. As an insurance company, Zurich knows how to draft an exclusion specifically excluding losses or damage arising from a pandemic. The risks associated with viruses and pandemics have been known to the insurance industry for a century and have been well known to

Zurich in recent decades during which we all have witnessed outbreaks and pandemics involving viruses such as SARS, MERS, H1N1, and Zika.

194.    Because these risks are well known, there are exclusions in common usage in the insurance industry that specifically reference losses caused by pandemics.  However, Zurich did not include such specific pandemic exclusions as part of the Zurich Policy it sold to Masterworks.

195.    Second, by virtue of the Louisiana Endorsement, the language of the Contamination Exclusion was modified to delete the term "virus" from the definition of Contamination, thus indicating Zurich's intention to provide coverage for losses or damages due to a virus.

196.    Given the timing and tenor of its reservation of rights letter, Zurich has no intent to conduct a meaningful investigation of its policyholder's claim.

197.    As a result of Zurich's effective wrongful denial of coverage in breach of the Policy, Masterworks has suffered damage, in an amount to be determined at trial, but not less than $300 million and will continue to suffer damage.

### FIRST CAUSE OF ACTION
**(Declaratory Judgment)**

198.    Masterworks incorporates by reference the allegations contained in the preceding paragraphs.

199.    As set forth above, the Zurich Policy sold to Masterworks covers losses it now suffers as a result of the COVID-19 pandemic, the continuous presence of SARS-CoV-2 and individuals who contracted or suffered from COVID-19 on its property or at its customers' properties, the spread and transmission of COVID-19, and the numerous civil authority orders that imposed operating restrictions on both Masterworks' premises and those of its direct and

indirect customers which constituted a direct physical loss of property on their premises by limiting their use or full use of their physical space.

200.    Masterworks has suffered actual losses and incurred extra expense due to physical loss and damage caused by the COVID-19 pandemic, a risk not excluded by the Zurich Policy.

201.    Zurich breached and continues to breach its promises as set forth in the Zurich Policy by, among other things, failing and/or refusing to honor its promises to pay for loss of or damage to property and time element coverages now being suffered by Masterworks as a result of the COVID-19 pandemic, the continuous presence of SARS-CoV-2 on its properties, the spread and transmission of COVID-19 and the civil authority orders.

202.    As a direct and proximate result of Zurich's contractual breaches and refusal to acknowledge its coverage obligations, Masterworks has suffered and will continue to suffer serious harm in an amount to be determined at trial.

203.    An actual and justiciable controversy exists between Masterworks and Zurich regarding the interpretation, application and meaning of the Zurich Policy.

204.    Accordingly, Masterworks is entitled to declaratory judgment of its rights and of Zurich's obligations under the Zurich Policy.

205.    Declaratory relief from this Court will resolve all outstanding issues between Masterworks and Zurich under the Zurich Policy.

### COUNT II
### (Breach of Contract)

206.    Masterworks incorporates by reference the allegations contained in the preceding paragraphs.

207.    The Zurich Policy is a valid contract between Masterworks and Zurich.

- 45 -

208.     Masterworks provided timely notice to Zurich of its claims under the Zurich

Policy.

209.     Masterworks has substantially performed or otherwise satisfied all conditions

precedent to bringing this action and obtaining insurance coverage under the Zurich Policy and

applicable law, or alternatively, Masterworks has been excused from performance by Zurich's

acts, representations, conduct and/or omissions. Alternatively, by its conduct and actions, Zurich

has waived any such conditions or should be estopped from asserting them.

210.     Masterworks has incurred, and will incur in the future, loss of income, extra

expenses and other covered loss or damage due to the COVID-19 pandemic, SARS-CoV-2, and

orders of civil authority that closed operations for Masterworks' direct and indirect customers.

211.     In breach of the Zurich Policy, Zurich refused or otherwise failed to recognize any

coverage afforded for Masterworks' loss, damage and/or costs.

212.     Masterworks has suffered hundreds of millions of dollars in damages as a result

of Zurich's breach of contract.

213.     Masterworks is entitled to breach of contract damages, including the full amounts

owed under the Zurich Policy, the reasonably anticipated consequential damages of Zurich's

breach, without regard to Zurich's policy limits, including, without limitation, the possible loss

of hotels to foreclosure, pre- and post-judgment interest, and all reasonable and necessary

attorneys' fees Masterworks may incur through trial, appeal, and Supreme Court review pursuant

to TEX. CIV. PRAC. & REMEDIES CODE § 37.009 and § 38.001.

## JURY DEMAND

214.     Pursuant to the provisions of Rule 216 of the Texas Rules of Civil Procedure,

Masterworks makes this demand for a jury trial in this litigation.

- 46 -

## **PRAYER**

WHEREFORE, Masterworks seeks judgment in its favor as follows:

Count I

    a)  Masterworks suffered loss, damage and/or costs covered under the Zurich Policy;

    b)  The continuous presence of SARS-CoV-2, the spread and transmission of COVID-19 and the resulting civil authority orders caused physical loss or damage to property sufficient to trigger coverage under the Zurich Policy;

    c)  The Zurich Policy's Contamination Exclusion does not bar or limit coverage for the loss, damage and/or costs suffered by Masterworks;

    d)  The entry of an Order declaring that Zurich must pay Masterworks the damages established at trial for direct loss or damage to covered property, for the loss of income sustained by Masterworks due to SARS-CoV-2 and the necessary suspensions of its direct and indirect customers' operations, for extra expenses, and for all additional coverages provided under the Zurich Policy; and

    e)  any such additional relief as the Court deems just and appropriate.

Count II

    a)  The entry of an award requiring Zurich to pay Masterworks all monetary damages suffered by Masterworks caused by Zurich's breaches, including, without limitation, compensatory damages in an amount to be determined at trial, consequential damages, prejudgment interest, post-judgment interest, and attorneys' fees and costs; and

    b)  any such additional relief as the Court deems just and appropriate.

Dated:  March 3, 2021

                Respectfully submitted,

                **REED SMITH LLP**

                By:  /s/ J. James Cooper

                J. James Cooper
                TX. I.D. No. 04780010
                REED SMITH LLP
                811 Main Street
                Suite 1700

Houston, Texas 77002
Telephone: 713.469.3800
Facsimile: 713.469.3899
jcooper@reedsmith.com

**ATTORNEY FOR PLAINTIFFS**